DEN EX DEM. HOWELL v. ASHMORE.

1. The general rule of law is, that a tenant cannot dispute the title of his land-lord or of the person under whom he entered. The cases where the land-lord's title has expired, or has been changed by act of law, as by a sheriff's sale, are exceptions to this rule. But the case of an adverse latent title arising from a defect in the conveyance to the landlord, which is set up only by the tenant as an outstanding title, without any right under it, or attornment to the owner, is not within the exceptions.

2. If the interest of a witness appear at any time during the examination in chief, either in direct or cross-examination, his testimony should be over-ruled. And, for the purpose of showing such interest, he may be asked, on his cross-examination, the contents of a writing under which such interest arises, without accounting for its absence, in the same manner as he might upon his *voir dire*.

The premises in dispute in this case were two lots of land in the township of Nottingham, in the county of Mercer. The cause was tried before Justice Randolph, at the Mercer circuit, in September term, 1847. The premises in dispute were part of the estate of which James Mathis the elder died seized many years since. After his death, being intestate, his children divided his real estate among them by parol, and have since held according to that partition. In that decision the lands in question fell to the share of James Mathis the younger. James Mathis the younger died before the year 1814, intestate, leaving Sarah his daughter, the wife of John Milward, his only heir-at-law. John Milward and Sarah his wife, by deed dated September 17, 1814, conveyed the premises in question to Joseph Ashmore absolutely in fee. This deed was ac-knowledged by the grantors, but there was no private exami-nation of Sarah Milward, in whom the title was, apart from her husband. Anthony Ashmore, a son-in-law of James Ma-this the elder, was put in possession of this lot by Joseph Ashmore after this purchase, and with his son Thomas Ash-more, the defendant, who lived with him, cultivated it. While the land was so in possession of Anthony and his son Thomas, James Ashmore, another son of Anthony, who, as well as Thomas, was unmarried and lived with Anthony, at the re-quest of his father, bought these lots of Joseph Ashmore, who conveyed them to James, by deed dated June 24, 1816. James

Ashmore was a cooper by trade, and did not work on the farm or lands cultivated by his father. He continued to live in the family with his father about a year after the deed to him. Thomas lived with his father, Anthony, until the death of the latter, in 1826, and during his father's life, and after his death until this action, cultivated these lots, and was in possession of them, he supporting and providing for his father's family. There was no written or verbal lease of these lots from James in evidence, but there was evidence that Thomas had, at different times until within a year or two, called them and shown them as James' lots. James Ashmore, by deed dated December 27, 1845, conveyed these lots in fee to Peter Howell, the lessor of the plaintiff. After the execution of the deed to Joseph Ashmore Sarah Milward died, and her husband, who survived her, had also died before the date of the deed to the lessor of the plaintiff.

On the cross-examination of Mitchel Wright, a witness of the plaintiff, it came out that James Ashmore received only part of the consideration of the sale at the execution of the deed from him to Howell, and took Howell's note for the residue, to be paid when Howell received peaceable possession of the premises; and that James Ashmore, by will, had given the residue of his estate to the wife of Mitchel Wright, the witness. Upon the defendant moving that the testimony of the witness Mitchel Wright, should be stricken out, the court overruled the motion, on the ground that the objection came too late.

Under the charge of the court, a verdict was rendered for the plaintiff. Upon the coming in of the *postea,* a rule to show cause why a new trial should not be had, was granted. The argument was had on this rule.

Argued before NEVIUS, CARPENTER, and OGDEN, Justices, by *W. L. Dayton,* in support of the rule, and *P. D. Vroom,* against it.

NEVIUS, J. This case, as presented here, covers much paper, but involves only two serious questions. I will state the facts out of which these questions arise as briefly as I can,

and without special regard to the order in which they appeared at the trial, as that is not material to the decision of these questions.

The premises for which the action is brought are two lots of land in the township of Nottingham, in the county of Mercer, of which James Mathis died seized before the year 1814, and which, with other lands, descended to his heirs-at-law, one son and four daughters. James Mathis, the son, after the death of his father, died intestate, leaving an only daughter, Sarah, who intermarried with John Milward. On the 17th of September, 1814, Milward and wife conveyed the lands in dispute, by deed, to Joseph Ashmore, the same having before been set off and assigned to the said Sarah, in a voluntary partition, made among themselves, by the heirs of the said James Mathis the elder.. This deed was executed and acknowledged by the said Sarah Milward, but not on a private examination and separate and apart from her husband. Previous to the execution and delivery of this deed, Anthony Ashmore, father of the defendant, who had married one of the daughters of James Mathis, was in the actual possession of these lots, and continued such possession after said conveyance, and requested his elder son James to purchase them, and give them to his younger son Thomas, the defendant. At that time the father was aged and infirm, and had, to a great extent, given up the charge of his family, and cast the burthen upon Thomas, who took it in charge, and cultivated these lands. James made the purchase of Joseph for the consideration of one hundred and seventy dollars, as appears by the deed made to him in 1816; and, on obtaining this deed, delivered it to Thomas, who gave it to his mother, in whose possession it remained till her death.

Before James made this purchase, he had boarded in the family of which Thomas had the charge and maintenance for one year, and continued to board there a year and a half after the purchase without paying board. He then left the premises, and resided elsewhere until his death, in 1845. Thomas remained on the premises, and cultivated and improved them during the lives of his father and mother, contributing to their

support, the former dying in 1826 and the latter at a much later period, and is still in possession.

In 1845, James, who had become debilitated in mind and body, and was then living with one Mitchel Wright, in the county of Hunterdon, conveyed these lands, by deed, to the lessor of the plaintiff for two hundred dollars, of which fifty dollars was paid at the time of the conveyance, and the balance was to be paid when he obtained possession, and not before. During the whole time that Thomas was in possession, *to wit*, from 1814 to the commencement of the suit, he paid all taxes, but never any rent; nor was there any evidence that any rent was ever demanded of him, or that there ever was any express agreement between him and James that he should be the tenant of the latter, or pay any rent. John Milward, the husband of Sarah Mathis, in whom the fee simple of these lands was vested, died before the commencement of the suit.

Upon this case, briefly, but I believe substantially stated, the first question is, can the plaintiff recover upon the title shown ? His title rests on the deed from Milward and wife to Joseph Ashmore, in 1814, and if this deed was so defectively executed as not to convey the fee simple title of Sarah Milward, then on the death of her husband, John Milward, the lessor's title became extinguished, and the right of possession, as well as title, was in Sarah Milward, or in case of her death was vested in her heirs-at-law. I think that the fee did not pass by the deed from Milward and wife. She, a *femme covert*, could not be divested of her title, except by deed acknowledged by her in the mode prescribed by the statute, that is on a private examination apart from her husband. There was no such acknowledgment in this case, at least the certificate does not show it. It follows, then, that the title made to Joseph Ashmore, under whom the plaintiff claims, had expired before suit brought, and there was no right of entry in him.

But it was argued that the defendant cannot raise that defence here, because he came in as tenant to James Ashmore, or held under him, and cannot deny or impeach his landlord's title. No rule of law is better settled, than that a plaintiff in ejectment must recover on the strength of his own title, or that

he must show a good legal title or right of possession to the lands in dispute before he can eject the tenant, whose actual possession is *prima facie* a good title until a better is shown. But however general this rule, it is not universal, and has its exceptions, one of which is, that a tenant who enters upon premises by virtue of a lease or by permission of another, is not permitted, in an action by the landlord, to dispute the title of the latter, which by his own act he has acknowledged. He shall not be permitted to get possession of lands by admitting the title of another, and then retain that possession by denying it. The true meaning of this is, that a tenant shall not deny the title under which he entered, or set up a title in another, in contravention of the one he has admitted. But a tenant may always show that his landlord's title has expired at the time of suit brought, (*England* v. *Slade*, 4 *T. R.* 682; 1 *Dowl. and R.* 1; *Neave* v. *Moss*, 1 *Bing.* 360,) or that he has sold his interest in the premises, (*Doe* v. *Watson*, 2 *Star. R.* 230,) or that it is aliened from him by judgment and operation of law, (*Jackson* v. *Davis*, 5 *Cowen* 123, 135). (*a*) This is no denial of the landlord's original right. There is nothing in such a defence incompatible with the tenant's implied admission in accepting the lease. It was therefore perfectly competent for the defendant to show that the title to these lands was not in the lessor of the plaintiff. But it became unnecessary for him to do so, for the plaintiff showed it by the evidence which he himself produced. Upon the production of his own deed, which he deemed necessary to show, as the foundation of his right to recover, and the evidence of Milward's death, the fact that his title had expired clearly appeared. The deed to Joseph Ashmore recites that the fee simple of the land was in Sarah Milward, as heir-at-law of James Mathis, who was one of the heirs of James Mathis the elder; and the plaintiff himself produced this deed, which did not convey that fee. He did not rely upon a written or parol lease, and, indeed, no such lease or agreement was shown; on the contrary, the whole evidence tended rather to prove a parol gift of the lands

(*a*) See, also, *Jackson* v. *Rowland*, 6 *Wend.* 666; *Brudnell* v. *Roberts*, 2 *Wils.* 143; *Blake* v. *Foster*, 8 *T. R.* 487; *Treport's case*, 6 *Co.* 15.

to the defendant by James Ashmore, than the relation of land-lord and tenant between them. But even admitting that the plaintiff had by implication established that relationship, he was bound to show that there was an end to that tenancy, either by expiration of the lease or by notice to quit, or in some other way, which he failed to do.

There is another important question involved in this case. In the progress of the trial, it became a matter of serious in-quiry, whether the defendant had not, upon some occasion, acknowledged the title of James Ashmore, and also whether James Ashmore was or was not of sane mind when he exe-cuted the deed to the lessor of the plaintiff. To establish the affirmative of both these propositions, the plaintiff called one Mitchel Wright, who was a subscribing witness to said deed, and who testified positively to the mental capacity of the grantor, and also to the defendant's calling the land James Ashmore's. On being recalled to the stand, and cross-exam-ined, he said, that James Ashmore resided with him at the time the deed was executed and when he died; that he had made a last will and testament, wherein he had bequeathed his property to his (witness's) wife and children, and that a note of the plaintiff's lessor for one hundred and fifty dollars, part of the consideration for the lands, and payable when pos-session was recovered, was part of the property so bequeathed. It was objected, that the contents of this will, showing the in-terest of the witness, could not be proved by parol, but that the will itself, or an exemplified copy, should be produced, and the court sustained this objection. The witness was then asked, whether he had any interest in the property of James Ashmore, and, on objection made, the question was overruled by the court. I think the court was in error in both these rulings. The defendant was entitled to prove the incompetency of this witness, from his interest in the event of the suit, at any stage of the cause, when he first had reason to suspect the existence of such an interest. And as this was a collateral point, the strict rules of evidence did not require the production of the will. The witness himself was competent to swear, as to the fact, the nature, and extent of the interest he had under the

will of James Ashmore. In *May* v. *Gray*, 2 *Penn.* 840, the late Chief Justice Kirkpatrick said, " It is altogether within the rule of law to interrogate a witness as to his interest, after he has been sworn in chief, and if he turns out to be interested, to overrule his testimony. And as to the doctrines set up here, that the witness must produce the written documents upon which his interest rests, it is entirely without foundation." This, with the single qualification, that the witness should be interrogated as to his interest, as soon as that interest is suspected, I take to be sound law and sound sense, and by this rule the court below erred in requiring the production of the will, and overruling the question put to the witness touching his interest. It may be that the other testimony in the case was sufficient to establish the mental capacity of James Ashmore at the time of executing this deed ; but Mitchel Wright was an important witness on this point, as well as on the other above mentioned, and we cannot tell the effect his testimony had upon the verdict of the jury.

In my opinion the verdict ought, for these reasons, to be set aside, and a new trial granted.

CARPENTER, J.  Joseph Ashmore acquired the premises in dispute by deed, dated September 17, 1814, from John Milward and wife.  The property was a part of real estate previously belonging to one James Mathis, but then deceased, and had been held by Milward in right of his wife, who was a daughter of Mathis.  It is said that the partition of the real estate of Mathis was informal and by parol merely, but it had been so held for so many years that no question can now be raised in this case on that point.

It is said that the deed by Milward and wife was inoperative ; so far as regards the wife, the certificate of her acknowledgment being informal, and that Milward having died some two or three years before suit brought, all the interest which passed by this deed ceased ; that, even if the defendant entered under James Ashmore, and in such case might be estopped from denying the title of the person under whom he entered, yet that he is not estopped from showing that that title has

expired.  The rule by which, in ejectment, a tenant is concluded from denying his landlord's title, rests on the ground of an equitable, and not a technical estoppel, and, with its exceptions, must depend upon the particular circumstances of each case.  The exception, that the tenant may show that the title of the landlord has expired, is for the protection of the tenant when some equity intervenes, and is scarcely to be applied to the case of a mere doubtful latent adverse title, set up only by the tenant himself, without any rights under it.  The deed of Mathis and wife may or may not convey the interest of the wife; but she has set up no claim, nor has the tenant, to prevent an eviction, consented to hold under her.  There is, therefore, nothing in the case to enable the tenant to invoke the benefit of this exception to the general rule.  Indeed, so far from admitting the entry and possession under James Ashmore, and then, upon the expiration of his title, admitting the supposed title of Mrs. Milward, the defendant has entirely denied the title of his landlord, and claimed to hold against him by adverse possession. He has disclaimed the title of the supposed landlord, and must stand or fall by the title he has set up in himself.

Joseph Ashmore conveyed the premises by deed, dated June 26, 1816, to James Ashmore, who, December 27, 1845, conveyed the same to Peter Howell, the lessor of the plaintiff. The defendant has been in possession ever since 1816, having taken possession of the premises shortly after the purchase by James Ashmore.  He has tilled the premises, and used them, so far as they were susceptible of use, from that time to the present; he has paid the taxes, and they have been known as, and called the lots of the defendant.  He claims, therefore, to hold them against the plaintiff, by an alleged adverse possession of more than thirty years.  But, according to my judgment, there is nothing upon which to found an adverse possession; no entry is shown under claim and color of title.  It clearly appears that Thomas entered under his brother, and held the premises permissively under him, and he is therefore not entitled to defend his possession adversely against James, or against the lessor of the plaintiff claiming under James.

James, Thomas, their father, and one sister, at the time of the purchase, formed one family. James continued to live with his father, brother, and sister for about eighteen months after this property was purchased by him. The testimony of the defendant himself shows that the purchase was made by James, in consideration of these circumstances. The use of the property was a suitable contribution to his family by a son, whose success in business was such as enabled him so to aid them. It was, however, the use of the land that was intended to be given, not the land itself, or the deed would have been drawn otherwise than to James himself. James purchased the land in his own name, and his title was acknowledged long subsequently by the brother, who entered under him. Nothing like a claim to hold adversely appears until within a short period, and there is nothing in the case on this point which creates any doubt on my mind as to the correctness of the result to which the jury arrived, or leads me to think that the verdict should be disturbed.

But there is a difficulty in regard to the evidence of Mitchel Wright. He was called by the plaintiff, and no question was raised as to his competency upon the examination in chief. Upon the cross-examination, the defendant alleged that he had discovered him to be interested under the will of James Ashmore: the wife of the witness being the sole legatee and devisee, and the property, as alleged, having been sold under an agreement that the payment of the consideration money should depend upon the success of the lessor of the plaintiff in obtaining possession, I see no difficulty as to the time and mode of raising the objection, though it is not so clear whether it is to be claimed as a strict right, or whether it does not, in some degree, depend upon the discretion of the judge. The strictness of the rule, if the witness has been once sworn and examined in chief, has been relaxed, and the objection may be taken at any time, provided, as is held in some of the cases, that it be done as soon as the interest has been discovered. 1 *Greenl. Ev.* § 421; *Jacott* v. *Layborn*, 11 *M. & W.* 685; *Den d. Downam* v. *Camblos*, 1 *Green* 436; *Shurtliff* v. *Willard*, 19 *Pick.* 212. Here the offer to prove the interest of the wit-

ness was not only on the cross-examination, but by the con tents of a will, the will not being produced. It was objected by the counsel of the plaintiff, that the will must be produced, and that a cross-examination on the point of interest was no exception to the general rule. The court sustained the objection. I think that in this the judge, in the haste of the trial, erred.

On an examination upon the *voir dire*, and in preliminary inquiries of the same nature, if the witness discloses the existence of a written instrument, it is clearly settled that he may also be interrogated as to its contents. The general rule does not apply in such case, for the objecting party may have been in ignorance of the instrument, or, at any rate, of any necessity for its production until disclosed by the witness; nor could he be supposed to know that such witness would be produced. 1 *Greenl. Ev.* § 95; *Ib.* § 422; 1 *Phil. Ev.* 132 (*Cow. ed.* 1842); *Carlisle* v. *Eady*, 1 *C. & P.* 234, *note.* But though such inquiry into the contents of written instruments is clearly admissible on the *voir dire*, Lord Ellenborough was disposed to confine it to the *voir dire.* In one case he said it could only be in its due order before the examination in chief. He said, that if at any time it appeared incidentally that the witness was interested, he would strike out his evidence; but that on cross-examination he would not allow the privileges of an examination on the *voir dire.* He refused to permit such question to be put upon the cross-examination, though the only object was to show that the witness was interested. *Howell* v. *Lock*, 2 *Camp.* 14. The reason for such rule is not very ·obvious where there has been no negligence, by which the party may be deemed to have waived the objection. In the case supposed, the testimony, as well on the cross-examination as on the *voir dire*, is addressed to the court, and not to the jury. When the interest is discovered, and the witness is questioned on this point, the examination becomes in its nature preliminary, and the case seems to be equally within the reason of the rule, which excuses the production of the instrument upon the *voir dire.* But there is an express decision in this state, where a different rule was followed. The court held

that a witness might, on cross-examination, be interrogated as to his interest, without producing the documents upon which it was said to arise. *Mayo* v. *Gray*, 2 *Penn.* 837.

The evidence of the contents of the will was overruled, and by possibility such evidence as might have excluded the witness's whole testimony was very direct and positive upon material matters strongly controverted on the trial. Such error may not be fatal where, if the testimony of the witness objected to be stricken out, the court can plainly see that there is still sufficient evidence to sustain the verdict, and they are clear that the jury have arrived at the proper conclusion, the motion for a new trial being addressed to the discretion of the court. But I am not satisfied that this is such a case, and on the last ground I concur in setting aside the verdict.

OGDEN, Justice, concurred with Justice CARPENTER. The CHIEF JUSTICE and Justice RANDOLPH did not hear the argument, and expressed no opinion.

                                                New trial granted.

CITED *in Shields* v. *Lozier*, 5 *Vr.* 500.